# EXHIBIT "A"

## Summons and Complaint

*William Hobek*
*v.*
*The Boeing Company*
*Civil Action No. 2016-CP-10-5743*

STATE OF SOUTH CAROLINA )
) IN THE COURT OF COMMON PLEAS
COUNTY OF CHARLESTON COUNTY )
)
) CIVIL ACTION COVERSHEET
William Hobek )
Plaintiff(s) )

10 -CP- 10 - 5743

vs. )
)
THE BOEING COMPANY )
Defendant(s) )

FILED
2016 OCT 26 PM 4:03
BY
JULIE J. ARMSTRONG
CLERK OF COURT

(Please Print)
Submitted By: BONNIE TRAVAGLIO HUNT
Address: POST OFFICE BOX 1845, GOOSE CREEK SC 29445

| | |
|---|---|
| SC Bar #: | 12341 |
| Telephone #: | **843-553-8709** |
| Fax #: | 843-492-5509 |
| Other: | |
| E-mail: | BTHUNT@HUNTLAWLLC.COM |

NOTE: The cover sheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of docketing. It must be filled out completely, signed, and dated. A copy of this cover sheet must be served on the defendant(s) along with the Summons and Complaint.

## DOCKETING INFORMATION (Check all that apply)
### *If Action is Judgment/Settlement do not complete*

☒ **JURY TRIAL** demanded in complaint.  ☐ **NON-JURY TRIAL** demanded in complaint.
☐ This case is subject to **ARBITRATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☐ This case is subject to **MEDIATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☐ This case is exempt from ADR. (Proof of ADR/Exemption Attached)

## NATURE OF ACTION (Check One Box Below)

| Contracts | Torts - Professional Malpractice | Torts – Personal Injury | Real Property |
|---|---|---|---|
| ☐ Constructions (100) | ☐ Dental Malpractice (200) | ☐ Assault/Slander/Libel (300) | ☐ Claim & Delivery (400) |
| ☐ Debt Collection (110) | ☐ Legal Malpractice (210) | ☐ Conversion (310) | ☐ Condemnation (410) |
| ☐ Employment (120) | ☐ Medical Malpractice (220) | ☐ Motor Vehicle Accident (320) | ☐ Foreclosure (420) |
| ☐ General (130) | Previous Notice of Intent Case # | ☐ Premises Liability (330) | ☐ Mechanic's Lien (430) |
| ☒ Breach of Contract (140) | 20____-CP-____-____ | ☐ Products Liability (340) | ☐ Partition (440) |
| ☐ Other (199) | ☐ Notice/ File Med Mal (230) | ☐ Personal Injury (350) | ☐ Possession (450) |
| | ☐ Other (299) | ☐ Wrongful Death (360) | ☐ Building Code Violation (460) |
| | | ☒ Other (399) **Employment** | ☐ Other (499) |

| Inmate Petitions | Judgments/Settlements | Administrative Law/Relief | Appeals |
|---|---|---|---|
| ☐ PCR (500) | ☐ Death Settlement (700) | ☐ Reinstate Driver's License (800) | ☐ Arbitration (900) |
| ☐ Mandamus (520) | ☐ Foreign Judgment (710) | ☐ Judicial Review (810) | ☐ Magistrate-Civil (910) |
| ☐ Habeas Corpus (530) | ☐ Magistrate's Judgment (720) | ☐ Relief (820) | ☐ Magistrate-Criminal (920) |
| ☐ Other (599) | ☐ Minor Settlement (730) | ☐ Permanent Injunction (830) | ☐ Municipal (930) |
| | ☐ Transcript Judgment (740) | ☐ Forfeiture-Petition (840) | ☐ Probate Court (940) |
| | ☐ Lis Pendens (750) | ☐ Forfeiture—Consent Order (850) | ☐ SCDOT (950) |
| | ☐ Transfer of Structured Settlement Payment Rights Application (760) | ☐ Other (899) | ☐ Worker's Comp (960) |
| | | | ☐ Zoning Board (970) |
| | ☐ Other (799) | | ☐ Public Service Commission (990) |
| | | | ☐ Employment Security Comm (991) |

| Special/Complex /Other | | |
|---|---|---|
| ☐ Environmental (600) | ☐ Pharmaceuticals (630) | ☐ Other (999) |
| ☐ Automobile Arb. (610) | ☐ Unfair Trade Practices (640) | |
| ☐ Medical (620) | ☐ Out-of State Depositions (650) | |
| ☐ Other (699) | ☐ Motion to Quash Subpoena in an Out-of-County Action (660) | |
| | ☐ Sexual Predator (510) | |

Submitting Party Signature: _____    Date: **October 17, 2016**

**Note:** Frivolous civil proceedings may be subject to sanctions pursuant to SCRCP, Rule 11, and the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code Ann. §15-36-10 et. seq.

## FOR MANDATED ADR COUNTIES ONLY
Allendale, Anderson, Beaufort, Colleton, Florence, Greenville,
Hampton, Horry, Jasper, Lexington, Pickens (Family Court Only), and Richland

SUPREME COURT RULES REQUIRE THE SUBMISSION OF ALL CIVIL CASES TO AN ALTERNATIVE
DISPUTE RESOLUTION PROCESS, UNLESS OTHERWISE EXEMPT.

**You are required to take the following action(s):**

1.  The parties shall select a neutral and file a "Proof of ADR" form on or by the 210th day of the filing of this action. If the parties have not selected a neutral within 210 days, the Clerk of Court shall then appoint a primary and secondary mediator from the current roster on a rotating basis from among those mediators agreeing to accept cases in the county in which the action has been filed.

2.  The initial ADR conference must be held within 300 days after the filing of the action.

3.  Pre-suit medical malpractice mediations required by S.C. Code §15-79-125 shall be held not later than 120 days after all defendants are served with the "Notice of Intent to File Suit" or as the court directs. (Medical malpractice mediation is mandatory statewide.)

4.  Cases are exempt from ADR only upon the following grounds:

    a.  Special proceeding, or actions seeking extraordinary relief such as mandamus, habeas corpus, or prohibition;

    b.  Requests for temporary relief;

    c.  Appeals

    d.  Post Conviction relief matters;

    e.  Contempt of Court proceedings;

    f.  Forfeiture proceedings brought by governmental entities;

    g.  Mortgage foreclosures; and

    h.  Cases that have been previously subjected to an ADR conference, unless otherwise required by Rule 3 or by statute.

5.  In cases not subject to ADR, the Chief Judge for Administrative Purposes, upon the motion of the court or of any party, may order a case to mediation.

6.  Motion of a party to be exempt from payment of neutral fees due to indigency should be filed with the Court within ten (10) days after the ADR conference has been concluded.

**Please Note:**    **You must comply with the Supreme Court Rules regarding ADR.**
**Failure to do so may affect your case or may result in sanctions.**

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS

COUNTY OF CHARLESTON )

WILLIAM HOBEK, ) C.A. No.: 2016-CP-10-5743
)
        Plaintiff, )
)
Vs. )
)
THE BOEING COMPANY, )
)
        Defendant. )
)
_____)

FILED
2016 OCT 26  PM 4: 04
JULIE J. ARMSTRONG
CLERK OF COURT
BY

## SUMMONS
### (JURY TRIAL REQUESTED)

You are hereby summoned and required to answer the complaint in this action, a copy of which is hereby served upon you, and to serve copy of your Answer to the Complaint on the subscriber at her office at 4000 Faber Place Drive, Suite 300, North Charleston, South Carolina 29405 or by Mail at Post Office Box 1845, Goose Creek, SC 29445 within thirty (30) days after the service hereof, exclusive of the day of service.  If you fail to answer the Complaint within the time aforesaid, the Plaintiff in this action will apply to the Court for the relief demanded in the Complaint and judgment by default will be rendered against you.

HUNT LAW LLC

_____
Bonnie Travaglio Hunt
Physical Address:
4000 Faber Place Drive, Suite 300,
North Charleston, SC 29405
Mailing Address
Post Office Box 1845, Goose Creek, SC 29445
(843)553-8709
bthunt@huntlawllc.com

October 24, 2015

| | |
|---|---|
| STATE OF SOUTH CAROLINA ) | COURT OF COMMON PLEAS |
| COUNTY OF CHARLESTON ) | C.A. No. __10__-CP-_10-_5743 |

WILLIAM H. HOBEK, )

     Plaintiff, )

v. )

                 **JURY DEMAND**

THE BOEING COMPANY, )

     Defendant. )

## Complaint and Jury Demand

    The Plaintiff, William H. Hobeck, by and through his attorney, complains against the Defendant, The Boeing Company, as follows:

### Nature of the Action

1. This action is brought pursuant to the Age Discrimination in Employment Act. The jurisdiction of this Court is invoked to secure protection of and redress deprivation of rights guaranteed by federal law, which rights provide for injunctive and other relief for illegal discrimination in employment.

2. This action is brought pursuant to the laws of South Carolina.

### Parties

3. Plaintiff, William H. Hobeck, is a Caucasian Male over the age of 40 years of age and a resident of the State of South Carolina.

4. Defendant was an employer in Charleston, South Carolina at the time the alleged acts of discrimination occurred. Defendant is and at all times relevant hereto was, business operating in the State of South Carolina and properly registered with the Secretary of State's office.

5.  Defendant is subject to the laws of the United States and the laws of the State of South Carolina.

6.  At all times relevant hereto, Defendant engaged in an industry affecting commerce and employed more than twenty (20) regular employees.

## Jurisdiction and Venue

7.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 as this matter involves a federal question based upon Title VII.

8.  The County of Charleston is the proper venue for this action pursuant because this is the District and Division in which the Plaintiff resides and in which a substantial part of the events or omissions giving rise to the claims occurred.

## Procedural Prerequisites

9.  That at all relevant times, the Plaintiff is an employee as defined by Age Discrimination in Employment Act and South Carolina law.

10. That at all relevant times, the Defendant, The Boeing Company was an employer as defined by Age Discrimination in Employment Act and South Carolina Law.

11. On August 16, 2016, the Plaintiff filed a charge of discrimination alleging discrimination in violation of the Age Discrimination in Employment Act with the Equal Employment Opportunity Commission ("EEOC").

12. The EEOC stated that the Charge of Discrimination was investigated.

13. That the Charge of Discrimination set forth the following: "On November 18, 2008, I was hired.  My last position was Quality Manger.  During my employment I received exemplary evaluations and no performance warnings.  The employer violated its policy when I was disciplined.  On May 5, 2016 I was discharged by Ron Pentz, LaPrincess

Porter, Steve Parrinello and Keith Casselberry. The issues for which I was disciplined and discharged were beyond my control and not my responsibility. Younger employees were not held to the same standards. The employer intentionally sperated older employees. I believe I have been discriminated against due to my age (65), in vioaltion of the Age Discrimination in Employment Act of 1967, as amended."

14. That the Plaintiff's right to sue was issued dated on August 24, 2016 by the EEOC. The right to sue set forth: "The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in complaince with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge."

15. The Right to Sue was received on August 29, 2016 by the Attorney.

16. That fewer than ninety days have elapsed since the Plaintiff received same.

## Factual Background

17. The Plaintiff is Caucasian male over the age of 40 years.

18. The Plaintiff is a highly experienced professional. The Plaintiff has over 32 years of experience in Quality and 40 years in Aviation.

19. The Plaintiff worked for the Defendant as a Quality Manager.

20. That as an employee the Plaintiff received training on the Defendant's policies and procedures and was required to follow. If the Plaintiff failed to follow the policies and procedures it would have lead to immediate termination. However, Boeing was not requried to follow the same policies and procedures and violated many of the policies during the Plaintiff's employment, termination and ADR process.

21. The polices and procedures set forth the following:

   a. *The Boeing Code of Conduct outlines expected behaviors for all Boeing employees. Boeing will conduct its business fairly, impartially, in an ethical and proper manner, and in full compliance with all applicable laws and regulations. In conducting its business, integrity must underlie all company relationships, including those with customers, suppliers, communities and among employees. The highest standards of ethical business conduct are required of Boeing employees in the performance of their company responsibilities. Employees will not engage in conduct or activity that may raise questions as to the company's honesty, impartiality, reputation or otherwise cause embarrassment to the company.*

   b. **Boeing Values**

   At Boeing, we are committed to a set of core values that not only define who we are, but also serve as guideposts to help us become the company we would like to be. And we aspire to live these values every day.

   c. **Integrity**

   We take the high road by practicing the highest ethical standards and honoring our commitments. We take personal responsibility for our own actions.

   d. **Quality**

   We strive for first-time quality and continuous improvement in all that we do to meet or exceed the standard of excellence stakeholders expect of us.

   e. **Safety**

   We value human life and health above all else and take action accordingly to maintain the safety of our workplaces, products and services. We are personally accountable for

our own safety and collectively responsible for each other's safety. In meeting our goals for quality, cost and schedule, we do not compromise safety.

**f.  Diversity & Inclusion**

We value the skills, strengths and perspectives of our diverse team. We foster a collaborative workplace that engages all employees in finding solutions for our customers that advance our common business objectives.

**g.  Trust & Respect**

We act with integrity, consistency, and honesty in all that we do.  We value a culture of openness and inclusion in which everyone is treated fairly and where everyone has an opportunity to contribute.

**h.  Corporate Citizenship**

We are a responsible partner, neighbor and citizen to the diverse communities and customers we serve. We promote the health and wellbeing of Boeing people, their families and our communities. We protect the environment. We volunteer and financially support education and other worthy causes.

**i.  Stakeholder Success**

By operating profitably and with integrity, we provide customers with best-value innovation and a competitive edge in their own markets; enable employees to work in a safe, ethical environment, with a highly attractive and competitive mix of pay and benefits, and the ability to further share in the company's success; reward investors with increasing shareholder value; conduct business lawfully and ethically with our suppliers, and help to strengthen communities around the world.

**j.  Ethics:**

Speaking up is a cornerstone for building an open and accountable workplace culture.
At Boeing, we believe that creating an environment where employees are comfortable
raising issues and concerns without fear of retaliation enables openness which can lead
to improved business performance and inspire greater innovation.  Boeing maintains
policies and procedures to encourage employees to report concerns and seek guidance,
using confidential and, when preferred, anonymous methods, including contacting
local ethics advisors, using toll-free phone numbers and accessing web-based portals.
Retaliation against employees who raise concerns is not tolerated and is cause for
appropriate corrective action, up to and including dismissal.

Boeing promotes awareness of the company's reporting system and non-retaliation
policies in recurrent employee communication, command media and posters that are
displayed in high-traffic work areas across the enterprise. Managers also are asked to
encourage speaking up within their own teams by using materials and resources
developed by the ethics group to foster dialogue and increase openness.  As part of the
company's Speaking Up initiative, managers and employees have access to a series of
modules with supplemental team activities that emphasize the importance of speaking
up, listening and taking action.  Electronic cards, or e-cards, can be used by all
employees to recognize colleagues for speaking up and demonstrating leadership.

22.  That the Plaintiff was considered an exemplary employee until he was transferred to work
     with Ronald Pentz.

23.  As a quality manager the Plaintiff had several duties and responsibilities regarding the
     safety and the quality of every airplane.

24. The Plaintiff was employed with the Defendant for several years with no issues. The Plaintiff began to witness issues that raised serious concerns regarding Quality and Safety.

25. The Plaintiff attempted to resolve the issues with his direct supervisors and his department. The attempts were ignored.

26. The Plaintiff's first noticed issues with the failure to inspect the aircraft within the procedures and protocols 2 years prior to his termination. The Defendant began to have more concerns with production rather than Safety and Quality of the aircraft. As a direct result the Plaintiff and his team began to suffer a hostile work environment as a direct result of their attempts to do their jobs.

27. In 2014, while working on 3rd shift the Plaintiff was approached by Ronald Pentz. Pentz asked the Plaintiff what he was doing. In response the Plaintiff informed Pentz that he was reviewing Data; that he believed that there were possible Process violations.

28. The next day Pentz approached the Plaintiff in a very aggressive manner and informed the Plaintiff that his concerns regarding violations should have never been elevated to a senior quality leader and it should have been handled at his level. Pentz failed and refused to take action. The Plaintiff tood the matter to Jack Hardick. Hardick took corrective against against the MT Lead for buying off 5 shake SOIs in a matter of 5 minutes and reopened the SOIs.

29. Soon after, as a result of his reports the Plaintiff was transferred to Parrinello on 2nd shift. The Plaintiff remained on second shift with Parrinello for a year. The Plaintiff reported several quality and safety issues. The Plaintiff's reports ignored.

30. In June 2015 the Plaintiff had a conflict with Parrinello regarding Production Cell 50. The Plaintiff and Parrinello were called to the Senior Manager's office to address concerns

regarding one of the Plaintiff's team. At this time the Plaintiff's team member was inspecting a plane and found some concerns regarding the fire barrier tape. The Defendant was only concerned with shipping the aircraft not with the team member's concerns. The Plaintiff was informed by his supervisor Parrinello that he and his inspector would be written up if they entered the aircraft. At that time the Plaintiff informed management that they were more concerned with the delivery of the aircraft than the quality and safety of the aircraft. Parrinello's response was Bill you know we can't find all defects. The Plaintiff replyed that when we do not have the correct process in place. The Plaintiff instructed his inspector to inspect the area in question. The inspector found over 40 defects in the area.

31. At this time the Plaintiff informed management that their interpretation of D doc was incorrect and needed to be corrected to follow the law. Sr. Quality Management interpretation was any defect would be reworked iwthout documentation. Parrinello became very angry with the Plaintiff and told the Plaintiff to elevate the Core Quality. The Plaintiff took these concerns to upper management. As a result of the Plaintiff's concerns a decision was made that all defects must be written and corrected through Velocity. The Plaintiff and others were informed that it was serious violation. Parrinello was directly responsible for the issue and took retaliation on the Plaintiff for his actions.

32. The Plaintiff reported Production and Quality for buying SOIs without doing the work. Leadership failed and refused to take action. The Plaintiff proceeded to go over Pentz and Parrinello's heads to get answers.

33. The Plaintiff took his concerns to Human Resources, Shelly Bolt. Bolt never responded to the Plaintiff's concerns or had any further contact with the Plaintiff.

34. As a result of Human Resources failure the Plaintiff took his concerns to Castleberry, the director. The Plaintiff offered supporting evidence to Castleberry. The Evidence was documentation containing data that set forth the Defendant's failures in addressing Quality and Safety issues. Castleberry refused to accept the evidence. Castleberry's actions were witnessed by Cynthis Kitchens, another employee who is no longer employed with the Defendant because of hostile work environment, intimidation and harassment.

35. As a result of everyone in Management's failure to address or handle the issues of Safety and Quality the Plaintiff went to Ethics in August of 2015.

36. The Defendant again refused to correct the problem. The Plaintiff's concerns were significant as the Safety of the planes being produced by the Charleston facility were directly affected.

37. That two weeks after his complaints to Ethics regarding the safety of the aircraft the Plaintiff was transferred to different position, MRSA, by the Defendant.

38. That the Plaintiff was transferred to work with Ronald Pentz, Manager, Steve Parrinello, senior manager, and Keight Castleberry, Director.

39. The Plaintiff was supervised by Sue Heitkamp for a period. The Plaintiff trusted Heitkamp.

40. The Plaintiff continued to witness safety and quality concerns. The Plaintiff reported issues to Ethics again in February of 2016.

41. The Plaintiff was again transferred.

42. The Plaintiff was transferred back to Pentz on the 18th of March 2016. The Plaintiff was well aware that this transfer back to Pentz was because of his complaints and his age. The

Defendant's actions were a direct attempt to end the Plaintiff's employment and to recoup his salary due to his experience.

43. The Plaintiff was informed that he was unable to perform his position properly because of his age and that is why he was making all the complaints.

44. On April 5, 2016, Ronald Pentz placed the Plaintiff on a Performance Improvement Plan.

45. On April 8, 2016, Pentz signed off on the Plaintiff's PIP stating that the Plaintiff was on track for 6 of 8 areas of the PIP.

46. The only two areas that Pentz addressed at this time were The Plaintiff addressed each of the issues with Pentz.

   a. Accountability-Bill explained to his team that the reason they are going to assume the metrics is that Elizabeth was retiring. I asked him to keep working on how he delivering the message. In this case, I explained that he needs to message this as an opportunity for the team to own the business and for job enrichment; not ownership by default.

**Background:**

**Elizabeth Gale had prepared a report that showed open NUT tags that were not closed by Quality, Engineering, MMO, Production and SCMA. Open tags exceeded 100 for both Mid and Aft. Data was generated through Velocity. Velocity is the tool used to communicate what function has the required action. This tool is used instead of emails or phone calls to get action and should be monitored by each function daily. Elizabeth set a unrealistic goal of the graph of 25. When I questioned the goals Pentz said he and Neil Wright said they were mandatory. I explained these were good stretch goals but in most cases out on MRSA control.**

Pentz said no these must be met by the goal date. ( witness HR Rep. Porter) I did everything in my control to get other function to complete their part of the Velocity process. Received push back from Engineering, MMO and SCMA that they could not meet the goal for various reasons. Contact Susan Parrine who was at most of the 8:30 meetings, Phil Mcleod, Engineering and Don Brodie SCMA,

Also another graph that showed over 600 open SOI's dating back to 2011. This is a very serious issue which identifies nonconforming parts that can't be accounted for. They may be on an aircraft. Some parts were reworked but SOI's not completed. ( Alenia parts with wrong part markings, contact Alenia rep. Genaro B. and my QS that worked on them Matt Johnson ). All Pentz was worried about was burning down the chart so he would look good. I refused to just close out the open SOI's without a thorough investigation. I had to go over his head, I had to contact Core Quality to get direction. Contact Dayne Davis. This alone could cost Boeing our PC. Davis agreed that no SOIs should be closed without complete investigation.

    b.  Positive relationships-bill visited XPO this week and met with Terry. He said that he told her that she is still not working KITS correctly. I asked him to sart focusing on positive and he said that he did give her an award also. Next week I expect to hear more positive. Also, he has a staff scheduled for next week that I will attend to observe.

47. Pentz continued discipline in an order to retaliate against the Plaintiff for his complaints. Each and every reason given for the discipline of the Plaintiff were pretextual and petty.

48. On April 15, 2016, Pentz created issues regarding the Plaintiff's employment in order to set the Plaintiff up for termination.

   a. **Accountability-** Still Struggling. During the week, Bill referred the burndown plan again as Elizabeths plan in front of his team. I corrected him immediately following the 4/13 meeting. During today's meeting conversation, he recognized the concern and will refer to any MRSA plan as "the teams plan" or "Our Plan"

   b. **Elizabeth Gale made the plan and was always called Elizabeth's plan. I took Pentz's concern and changed how the plan was presented to our team.**

   c. **Positive relationships-**No visits to XPO were made this week. Bill said that Terry was out sick Wednesday and Thursday, but back today. I said that today would be a perfect time to visit XPO then.  Also, there have been Zero staff meetings to date. He is not meeting expectations here.

   d. **I had plan to visit XPO on Wednesday. Terri who is my QS assigned to XPO called in sick and again on Thursday. I knew Terri was very busy due to her being out for two days so I decided to plan my visit until the following week. I did speak with her on the phone and asked her if there were any issues, she said no but was very bust caching up because of her sickness. I have made weekly visits ti XPO since that date.  I did everything within my power to meet the PIP concerns,**

   e. **The staff meeting was canceled this week because of high labor loss, including Terri Cook who out sick.**

   f. **The reason for the staff meetings was because Terri worked off-site and didn't feel part of the team. When I gave Terri the opportunity to work at XPO I**

**explained she would be working on her own. She explained that is what she**
**wanted.**

49.  On April 25, 2016, Pentz created issues regarding the Plaintiff's employment in order to set the Plaintiff up for termination.

    a.  **Performance Metrics 1:**

Not meeting expectations with Elizabeth sending out metrics this week instead of Bill's team.

    b.  **The metrics that Elizabeth ( Our metrics) is a very complex process of collecting data from various sources. Dee Wilson and Dane Culp were both in training given by Elizabeth Gale. Both will contest how cumbersome gathering this information and assuring it's accuracy. Dee started to issue the report on 4/27/16.  I did everything in my power to assume ownership of this report. In fact exceeded the goal of 5/1/16.**

    c.  **MRSA Business Goals 1,** Ducts continue to age in the queue, was on track, but is not meeting expectations now.

    d.  **Again this demand is outside of my control. All tags that are in MRSA's queue (my team's responsibilities) were worked immediately. I have no control when Engineering, MMO,and SCMA close their portion to the Velocity queues. I went above and beyond by contacting each function daily to push them to complete their queues. They explained many times that they could not meet the goal of 5days and a total of 25 open tags.**

50. On May 2, 2016, Pentz continued the systematic discipline of the Plaintiff in order to facilitate his termination. Each and every reasons given continue to be pretextual and petty and beyond the Plaintiff's control.

    a. **MRSA Business Goals 2:** Per Pentz all on track except:

    b. Aft Body has not revised any lost parts NC EPDs.

    c. **This references the 600 lost part open SOI's . The first step to close these SOIs as agreed by Core Quality was to issue Lost part forms to be completed by Production and MMO. In Aft body It took two weeks for Production C.J.Smith and MMO Mike Kazuba to complete. Once received I gave the task to Dee Wilson 5/3/16. He started the investigations to properly close the SOI's. Per C.J.Smith he found many errors as identified by Elizabeth Gale that need to be corrected for him to complete the task.**

    d. Mid body is revising and canceling lost part forms NC EPD but at a hold due to EE absence which is not meeting expectations for burn down because I gave him a replacement QS MRBD that could do this.

    e. **As Quality manager I made the decision not to ask this QS the task because of the sensitive nature of closing the SOIs without the training and the back ground of the issue. She was assigned to cover Mid and Aft MRSA and work MRSA queue on a Saturday. I would not put her or Boeing at risk of any mistakes because of a burndown chart with an unrealistic goal, log in parts and assist with any emergent MRSA issues that may arise.**

    f. **Follow Through:** Direction was given to provide Sherry with the top MRSA items and associated CAs for a presentation to the site VP. This was to be completed COB

4/27, but was not submitted until 4/28; when submitted it was inadequate; not meeting expectations.

g. **The Plaintiff responded to Pentz's allegations:** This is another false statement. I and John Barnett received a request from Sherry Slaughter for top MRSA issues and CAs. Pentz was not even aware of the request until I sent a email to Ron Howlier who manages the QAI group for support, Pentz was cc'ed for info. only. This is QAI's statement of work and collects and issues Correction Actions. I met with Ron Howlier on 4/27 to collect this data. He provided the top issues that they track daily. We came up with the top three isues and corrective actions and provided to Sherry on 4/28 was the due date. Sherry said this was good but needed additional info. This was provided by me and John Barnett.

h. **Preparation:** -MRSA meetings start on time and actions are prepared for the team. - 4/25 meeting notes did not come out until 12:11 and 4/28 notes did not release that is not meeting expectations of the PIP.

i. The Plaintiff responded to Pentz's allegations again: **The meeting notes was part of the PIP ruse. I did not release notes of 4/25 until 12:11 due to MRSA emergent issues to support Production. I did forget to send notes on 4/28. If I had access to emails and my calendar I may be able to explain why. I asked Pentz why he needed the meeting notes within 1 hour. He said that Keith Castleberry needed them immediately after the meeting, I asked Keith on 5/4/16 if he had ever read any of my meeting notes. He said "No" witness was Laprincess Porter.**

j. **Accountability:** We went through the safety promise in staff. Bill presented the powerpoint. During the presentation, Bill referred to this as Boeings number 1

initiative rather than ours. He then referred to it say "they" are really focusing on safety this year: not meeting expectations.

k. **This is a true statement. I said Safety is Boeing's #1 initiative. Ask anyone of my team what is their # 1 priority is. Safety. I have been telling my team since my first day as their manager. I probably used the word "they" referring that safety is the all executives and leaders within support this initiative. This is another example of the bogus PIP.**

l. **Accepting Senior Management Direction:** When I let Bill know that the excel spreadsheet that he sent in for the VP presentation was not adequate, he pushed back about him having to do it and said that QAI should be doing it rather than following direction. The MRSA is his role and he needs to own it.

m. **The spreadsheet was sent to Sherry Slaughter on time and she commented in an email that it was good. I tried to explain that there is a function that collects that data and provides reports on a regular basis. The QAI group is staffed and it is there their SOW. You would think a Sr. Quality leader would know this. Apparently Pentz does not know their SOW. I told Pentz I did not have anyone to preform this task. No one trained to collect, compile and generate reports. I asked for a staff analyst to help getting correct and accurate data. He refused to provide any support. John Barnett and I continued to update and revise the report for Sherry.**

n. **Positive Relationships: Staff Meeting Notes:** The staff meeting started again late at 2:38PM instead 2:30. Terry came in late and Bill told her that she was late and

needed to leave earlier to arrive on time. Shelby came in and all that was said was "well Shelby is here" but did not tell him it was not acceptable.

o. **My staff meeting was scheduled for 2:30. Terri was late because she lost her badge and had to go to Security to get a temp. badge.  Shelby was late because he works on second sift and traffic and the bus  was  running late.  I spoke to both after the meeting about the importance of being on time.  Both agreed to be on time for the next meeting.**

p. Also, during the meeting, Mr. Seaberry became disruptive on two occasions: I got a look from Angelike and Matt that showed concern. The first was when we were going through and picking out what people were doing on the powerpoint that was not safe. Seaberry said" I would hit on the lady that is on the airplane". The second instance was when we watching the Rosy the Riveter video. During that video he said that it was "eaasy to get a date with her". Nothing was said to stop it, but Bill make Angelika put away her cell phone.

q. **I did not hear any of the comments that Seaberry said.  I was focused on the video and identifying areas that were not safe. Everyone was speaking up and explaining was a condition showed was unsafe.   If anyone heard any unprofessional comments I would expect them to say something immediately . Especially a Sr, manager sitting in on the meeting. Pentz said nothing. This is another example that all Pentz was concerned about was trying to find anything to support the ruse PIP.   I contacted Matt and Angelika and Dee and asked what they heard. Two of them said they heard Seberry's comments.  I spoke to**

**Bob Seberry and explained that that type of comments were unacceptable. He said he would never do again.**

r. Safety promise training: waiting for the last minute. Dee was out sick and not we are counting on him showing up on the day that it is due.

s. **Safety promise training a day before the due date during my scheduled staff meeting. Pentz said he was coming to my meeting because he hadn't taken the training yet.**

t. **Communication-** Not clearly communicating with SCMA for status needed, not meeting expectations.

u. **This is another false statement. I sent numerous emails to Don Brodie to provide updates. He was invited to our 8:30 daily meetings. He showed up once and explained to the team he could not meet the**

51. The Plaintiff overcame each and every reason for discipline. The Defendant was well aware of the contention that he was being terminated because of his complaints and age.

52. The Plaintiff made several complaints regarding FOD. The Plaintiff's concerns were not addressed so the Plaintiff began to send daily emails with photos regaridng the Safety issues regarding FOD. The Plaintiff was told to stop sending the emails. The issue was never addressed.

53. On May 3, 2016, the Plaintiff had a meeting with Boeing, Vice President, Beverly Wyse and seven other managers regarding 3800 individuals being laid off in South Carolina. The Plaintiff was informed that the lay off would not affect him.

54. On May 4, 2016 the Plaintiff addressed the write up with Castleberry and informed him that the PIP was in retaliation for his complaints regarding Quality and Safety, Age

Discrimination. The Plaintiff informed Castleberry that the Defendant was using Pentz to terminated him. Castleberry informed the Plaintiff that he would investigate the matter and get back to him. Castleberry never got back with the Plaintiff.

55. The Plaintiff was terminated from his employment on May 5, 2016.

56. The Plaintiff entered into the ADR process as required by the Defendant's policy.

57. The Plaintiff attempted to recoup his position. The Plaintiff believed that he could address the Defendant's failures to address his employment. However during the ADR process the Defendant changed the process and did not allow the Plaintiff to take his grievance to a full committee as allowed by the policy.

58. The Defendant violated the plaintiff's rights by changing the ADR policy in the middle of the plaintiff's appeal in order to retaliate against the Plaintiff and to prevent the Plaintiff from addressing the Defendant's Safety and Quality Failures, the Defendant's discrimination in violation of the Law against Older Americans and the Defendant's wrongful termination of the Plaintiff.

59. That the Defendant, treated the Plaintiff significantly differently based on his age.

60. That the Defendant, disciplined the Plaintiff more harshly than other younger male employees.

61. The Plaintiff was disciplined for actions that other younger employees were not disciplined for. The Defendant threatened the Plaintiff with significant discipline in retaliation for his complaints.

62. That the Defendant's actions towards the Plaintiff violated the law.

63. That the Defendant is the direct and proximate cause of damage to the Plaintiff.

64.    That, as a direct and proximate result of the Defendant's intentional unlawful actions towards the Plaintiff based on the Plaintiff's age, the Plaintiff:

    a.    suffered severe emotional distress;

    b.    suffered future lost wages and future lost benefits;

    c.    suffered economic damages;

    d.    Loss of employment;

    e.    Loss of Future employment;

    f.    incurred attorney fees for this action;

    g.    incurred costs of this action; and

    h.    will incur future attorney fees and costs.

65.    That the Plaintiff is entitled to an award of damages in the amount of actual damages, compensatory damages, consequential damages, punitive damages, attorney's fees previous, future and present, costs of previous future and this action, and other damages such as this Honorable Court deems appropriate and just.

66.    That the Defendant wrongfully terminated the Plaintiff in violation of public policy when it terminated him because he reported Safety and Quality issues regarding the aircraft produced by the Defendant.

67.    That, as direct and proximate result of the Defendant's unlawful actions, the Plaintiff suffered lost wages and benefits.

68.    That the Plaintiff is entitled to recover an award against the Defendant in the amount of actual, consequential, compensatory and punitive damages.

69.    That the Defendant terminated the Plaintiff in violation of a clear mandate of public policy and in violation of South Carolina Law.

70. That as a direct and proximate cause of the Defendant's wrongful termination of the Plaintiff, the Plaintiff:

    a.  Suffered the loss of his job;

    b.  Suffered lost wages, the loss of his salary; and future increases thereof;

    c.  Suffered the loss of benefits associated with his job;

    d.  Suffered the loss of future benefits associated with his job;

    e.  Suffered consequential economic damages as a result of the loss of his job;

    f.  Incurred attorney's fees and costs as a result of having to bring this action.

71. That the Plaintiff is entitled to an award of damages against the Defendant for actual damages, consequential damages, punitive damages, attorney's fees, costs of this action and other damages, such as this Honorable Court deems appropriate and just.

<u>**FOR A FIRST CAUSE OF ACTION**</u>

<u>**AGE DISCRIMINATION IN VIOLATION OF THE**</u>

<u>**AGE DISCRIMINATION IN EMPLOYMENT ACT**</u>

72. That paragraphs one through seventy-three (73) are hereby incorporated verbatim.

73. That the Plaintiff was subjected Age Discrimination while employed with the Defendant.

74. That the Defendant, treated the Plaintiff significantly differently based on his age.

75. That the Defendant, disciplined the Plaintiff more harshly than other younger employees.

76. The Plaintiff was informed that he could not handle the job at his age.

77. The Plaintiff was disciplined for actions that other younger employees were not disciplined for. The Defendant threatened the Plaintiff with significant discipline in retaliation for his complaints.

78. That the Defendant's actions towards the Plaintiff violated the law.

79. That the Defendant is the direct and proximate cause of damage to the Plaintiff.

80. That, as a direct and proximate result of the Defendant's intentional unlawful actions towards the Plaintiff based on the Plaintiff's age, the Plaintiff:

    i.        suffered severe emotional distress;

    j.        suffered future lost wages and future lost benefits;

    k.        suffered economic damages;

    l.        Loss of employment;

    m.        Loss of Future employment;

    n.        incurred attorney fees for this action;

    o.        incurred costs of this action; and

    p.        will incur future attorney fees and costs.

81. That the Plaintiff is entitled to an award of damages in the amount of actual damages, compensatory damages, consequential damages, punitive damages, attorney's fees previous, future and present, costs of previous future and this action, and other damages such as this Honorable Court deems appropriate and just.

### FOR A SECOND CAUSE OF ACTION

### WRONGFUL TERMINATION

82. Paragraphs one (1) through eighty three (83) are hereby incorporated verbatim.

83.   That the Defendant wrongfully terminated the Plaintiff in violation of public policy when it terminated him because he reported Safety and Quality issues regarding the aircraft produced by the Defendant.

84.   That, as direct and proximate result of the Defendant's unlawful actions, the Plaintiff suffered lost wages and benefits.

85.   That the Plaintiff is entitled to recover an award against the Defendant in the amount of actual, consequential, compensatory and punitive damages.

86.   That the Defendant terminated the Plaintiff in violation of a clear mandate of public policy and in violation of South Carolina Law.

87.   That as a direct and proximate cause of the Defendant's wrongful termination of the Plaintiff, the Plaintiff:

   g.   Suffered the loss of his job;

   h.   Suffered lost wages, the loss of his salary; and future increases thereof;

   i.   Suffered the loss of benefits associated with his job;

   j.   Suffered the loss of future benefits associated with his job;

   k.   Suffered consequential economic damages as a result of the loss of his job;

   l.   Incurred attorney's fees and costs as a result of having to bring this action.

88.   That the Plaintiff is entitled to an award of damages against the Defendant for actual damages, consequential damages, punitive damages, attorney's fees, costs of this action and other damages, such as this Honorable Court deems appropriate and just.

## **PRAYER FOR RELIEF**

WHEREFORE plaintiff prays that this Honorable Court:

A.   Accept jurisdiction over this matter, including the pendent claim;

B.  Empanel a jury to hear and decide all questions of fact;

C.  Award the Plaintiff lost wages, future lost wages, lost benefits and future lost benefits;

D.  Award to plaintiff compensatory and consequential damages against the defendant;

E.  Award to plaintiff punitive damages against the defendant for their malicious and spiteful pattern of age discrimination;

F.   Award to plaintiff All damages available to the plaintiff damages against the defendant for their malicious discrimination against the plaintiff in violation of the ADEA;

G.  Award to plaintiff the reasonable attorneys' fees and costs incurred in the prosecution of this matter;

H.  Award all damages available to the Plaintiff pursuant to Federal and State Law;

I.   Permanently enjoin the defendants, their assigns, successors, agents, employees and those acting in concert with them from engaging in age discrimination, disparate treatment or retaliation against plaintiff and;

J.   enter any other order the interests of justice and equity require.

HUNT LAW LLC

Bonnie Travaglio Hunt
HUNT LAW LLC
4000 Faber Place Drive, Suite 300
North Charleston SC 29405
Post Office Box 1845, Goose Creek, SC 29445
(843)553-8709

Dated:  October 24, 2016